Minute Order Form (06/97)

# United States District Court, Northern District of Illinois

JSP

| Name of Assigned Judge or Magistrate Judge | Ronald A. Guzman | Sitting Judge if Other than Assigned Judge | |
|---|---|---|---|
| **CASE NUMBER** | 02 C 1390 | **DATE** | 9/19/2003 |
| **CASE TITLE** | Lid Electric Inc. vs. Local Union No. 134, et al | | |

**MOTION:** [In the following box (a) indicate the party filing the motion, e.g., plaintiff, defendant, 3rd party plaintiff, and (b) state briefly the nature of the motion being presented.]

**DOCKET ENTRY:**

(1) ☐ Filed motion of [ use listing in "Motion" box above.]
(2) ☐ Brief in support of motion due _____.
(3) ☐ Answer brief to motion due_____. Reply to answer brief due_____.
(4) ☐ Ruling/Hearing on _____ set for _____ at _____.
(5) ☐ Status hearing[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(6) ☐ Pretrial conference[held/continued to] [set for/re-set for] on _____ set for _____ at _____.
(7) ☐ Trial[set for/re-set for] on _____ at _____.
(8) ☐ [Bench/Jury trial] [Hearing] held/continued to _____ at _____.
(9) ☐ This case is dismissed [with/without] prejudice and without costs[by/agreement/pursuant to]
    ☐ FRCP4(m)   ☐ Local Rule 41.1   ☐ FRCP41(a)(1)   ☐ FRCP41(a)(2).
(10) ■ [Other docket entry] ENTER MEMORANDUM OPINION AND ORDER: Defendant's cross-motion for summary judgment is granted and the plaintiff's motion for summary judgment is denied. The EJAB exceeded its authority and its award against Lid does not draw its essence from the Principal Agreement because the provisions in question were not bargained for or agreed to by the ECA and Local 134 and thus did not form part of the Principal Agreement and Lid's non-bargaining unit employees are not covered by or subject to its terms. The December 19, 2001 decision of the EJAB is hereby vacated. This case is hereby terminated. This is a final order.
(11) ■ [For further detail see order attached to the original minute order.]

| | | | | |
|---|---|---|---|---|
| | No notices required, advised in open court. | | | **Document Number** |
| | No notices required. | | number of notices | |
| | Notices mailed by judge's staff. | | SEP 2 2 2003 | |
| | Notified counsel by telephone. | | date docketed | 30 |
| ✓ | Docketing to mail notices. | | | |
| ✓ | Mail AO 450 form. | | docketing deputy initials | |
| | Copy to judge/magistrate judge. | | | |
| | | | date mailed notice | |
| TBK | courtroom deputy's initials | | | |
| | | Date/time received in central Clerk's Office | mailing deputy initials | |

| | |
|---|---|
| LID ELECTRIC, INC. | ) |
| Plaintiff, | ) |
| | ) Case Number 02 C 1390 |
| v. | ) |
| | ) Judge Ronald A. Guzman |
| LOCAL UNION NO. 134, INTERNATIONAL BROTHERHOOD OF ELECTRICAL WORKERS and ELECTRICAL JOINT ARBITRATION BOARD | ) |
| Defendants. | ) |

## MEMORANDUM OPINION AND ORDER

Pending before the court are the parties cross motions for summary judgment pursuant to Federal Rule of Civil Procedure 56. For the reasons set forth below Plaintiff's motion for summary judgment is granted and Defendant's motion for summary judgment is denied.

## FACTUAL BACKGROUND

The facts of this case are essentially undisputed. Plaintiff Lid Electric, Inc. (Lid) is an electrical contractor whose principal place of business is in Wheeling, Illinois. (EJAB's 56.1 Statement ¶ 7; Plaintiff's 56.1 Statement ¶ 1). Defendant Local 134, International Brotherhood of Electrical Workers (Local 134) is a labor union that represents employees in the electrical industry. (EJAB's 56.1 Statement ¶ 8). Local 134 acts as the collective bargaining representative for Lid's journeyman, general foreman, and apprentice electricians. (Plaintiff's



1

56.1 Statement ¶ 3). The Electrical Contractors' Association of City of Chicago (ECA) is a multi-employer association. It is a local chapter of the National Electrical Contractors' Association (NECA). For approximately 100 years, NECA has represented its member employers and many non-member employers in collective bargaining with Local 134. (EJAB's 56.1 Statement ¶ 9). Defendant Electrical Joint Arbitration Board (EJAB) consists of five members appointed by NECA and five members appointed by Local 134. (EJAB's 56.1 Statement ¶ 10).

As of September 27, 1996, Lid executed a Letter of Assent agreeing to be represented by NECA in regards to collective bargaining with Local 134. (Plaintiff's Statement of Material Facts). The Letter of Assent reads:

> In signing this letter of assent [Lid Electric] does hereby authorize Electrical Contractors' Association of City of Chicago, Inc., NECA as its collective bargaining representative for all matters contained in or pertaining to the current and any subsequent approved inside labor agreement between the [ECA] and Local Union 134, IBEW. In doing so, the undersigned firm agrees to comply with, and be bound by, all of the provisions contained in said current and subsequent approved labor agreements. This authorization, in compliance with the current approved labor agreement, shall become effective on the 27 day of September, 1996. It shall remain in effect until either terminated by the undersigned employer giving written notice to the [ECA] and to [Local 134] at least one hundred fifty (150) days prior to the then current anniversary date of the applicable approved labor agreement.

(Plaintiff's Exhibit 2 Preamble).

The present litigation involves the Principal Agreement (or "Inside Agreement"). The Principal Agreement was negotiated "[b]y and [b]etween" the ECA and Local 134. The current Principal Agreement has been in effect since June 7, 1999. (EJAB's 56.1 Statement ¶ 15). It remains effective until June 2, 2003. (Plaintiff's Exhibit 1, § 18.01).

Section 1.02 of the Principal Agreement defines "[e]mployee" or "[e]mployees" as referring to Journeyman, General Foreman, Foreman, or Apprentices working for a contributing

2

Employer who is reported by the Employers for purposes of Federal payroll taxes. Section 3.20 of the Principal Agreement authorizes the EJAB to adjudicate contractual disputes involving the Principal Agreement. (Plaintiff's Exhibit 1, § 3.20). Section 3.11 of the Principal Agreement grants the EJAB authority to construe and interpret the Principal Agreement and to correct any violation of its terms. (Plaintiff's Exhibit 1, § 3.11). On December 2, 1998, EJAB members decided to replace the existing "Fitness for Duty Policy" with a new substance abuse program. (Plaintiff's Exhibit 1, Appendix A, p. 35, EJAB's 56.1 Statement ¶ 24). On September 21, 1999, the EJAB decided to implement a mandatory drug-testing program as part of the Principal Agreement. To accomplish this, the EJAB agreed that "enabling language" would be drafted and inserted into the Principal Agreement, the Communication Agreement and the Residential Agreement. (EJAB's 56.1 Statement ¶ 26).

On December 22, 1999, the EJAB sent a memorandum to all contractors bound by the Principal Agreement, Communication Agreement and Residential Agreement. The memorandum stated: "At the December 1, 1999, meeting of the [EJAB], the [EJAB] adopted the following enabling language which has been placed in all Collective Bargaining Agreements between the [NECA] and [Local 134]." The "enabling language" included in the December 22, 1999 memorandum has been adapted as Section 18.10 of the Principal Agreement. Section 18.10 provides:

> **Section 18.10:** The [EJAB] recognizes that the dangers and costs which alcohol and other chemical abuses can create in the electrical contracting industry as it relates to safety and productivity are significant. The [EJAB] resolves to combat chemical abuse in any form and agrees that to be effective, programs to eliminate substance impairment should contain a strong rehabilitation component. The parties recognize the employer's right to adopt and implement a drug and alcohol policy subject to all applicable laws and regulations, procedural safeguards, scientific principles and legitimate interests of privacy and confidentiality. The [EJAB] reserves the right to change or modify any section of the drug testing policy and procedures. The [EJAB] also recognizes that funding for this program will be borne by the employers. When

> drug and alcohol testing is performed, all testing shall be conducted in accordance with the procedures outlined in the aforementioned policy.

(Plaintiff's Exhibit 1 § 18.10).

It is from the "enabling language" of Section 18.10 that a new drug testing and substance abuse program was adopted. This new program is called the Electrical Industry Drug-Free Alliance (Alliance Policy).

The Alliance Policy states in part: "This policy applies to all employers represented by the Electrical Contractors' Association of City of Chicago, and IBEW Local 134. This also includes all maintenance, sales, clerical, management, owners, and part-time employees working 20 or more hours a week as well as applicants for any such position." (EJAB's Exhibit F, Introduction to Preamble to Policy, p. 1 ¶ 4). A letter dated October 20, 2000 from the ECA to all signatory Local 134 contracts stated "[t]his policy as negotiated and agreed to by the Electrical Joint Arbitration Board covers both bargaining unit and non-bargaining unit employees of signatory companies." (EJAB's Exhibit E ¶1, line 5).

On October 1, 2001, the EJAB filed a grievance against Lid for failing to comply with the Alliance Policy. Lid Electric refused to apply the Policy to anyone other than employees represented by Local 134. (EJAB's 56.1 Statement ¶ 35). On December 19, 2001, the EJAB issued a letter advising that it had determined that Lid was in violation of Section 18.10 of the Principal Agreement. To remedy this violation, the EJAB determined that Lid Electric's referral privileges would be suspended. (EJAB's 56.1 Statement ¶¶ 36, 37). Lid then filed this suit seeking to vacate the December 19, 2001 decision of the EJAB under § 301 of the Labor Management Relations Act, 29 U.S.C. § 185 (2001). As of November 15, 2002, Local 134 has not refused Referral System privileges to Lid. (Plaintiff's 56.1 Statement ¶ 18).

4

## DISCUSSION

Summary judgment is proper "if the pleadings, depositions, answers to the interrogatories and admissions on file, together with the affidavits, if any, show that there is no genuine issue as to any material fact and that the moving party is entitled to a judgment as a matter of law." Fed. R. Civ. P. 56(c); *Cox v. Acme Health Services, Inc.*, 55 F.3d 1304, 1308 (7th Cir. 1995). A genuine issue of material fact exists for trial only, if after viewing the record and all reasonable inferences drawn from it in a light most favorable to the non-movant, a reasonable jury could not return a verdict for the non-movant. *Anderson v. Liberty-Lobby, Inc.*, 477 U.S. 242, 248 (1986); *Hedberg v. Indiana Bell Telephone Co.*, 47 F.3d 928, 931 (7th Cir. 1995).

For cross-motions for summary judgment, each movant must individually fulfill the stringent requirements necessary to obtain summary judgment under Rule 56, such standards still being applicable. *United v. Ill. Central R.R.*, 998 F. Supp. 874, 880 (N.D. Ill. 1998). By filing cross-motions for summary judgment the parties do not waive trial, unless the judge disagrees. *Miller v. LeShea Broadcasting, Inc.*, 87 F.3d 224, 230 (7th Cir. 1996). Indeed upon cross motions for summary judgment, the court is not required to grant summary judgment as a matter of law for either side. *Brownlee v. City of Chicago*, 983 F. Supp. 776, 779 (N.D. Ill. 1997). Rather, the court will evaluate each motion on its merits, resolving factual uncertainties and drawing all reasonable inferences against the movant. *Id.*

The scope of judicial review of labor arbitration awards is very narrow. *Allied Tube & Conduit Corp. v. United Steel Workers of America, Local Union 6939*, 2000 U.S. Dist. LEXIS 10627 (N.D. Ill. (Feb. 22, 2000)). "An arbitrator is confined to interpretation and application of the collective bargaining agreement; he does not dispense his own brand of industrial justice. . .

5

his award is legitimate only so long as it draws its essence from the collective bargaining agreement." *Tootsie Roll Indus., Inc. v. Local Union No.1, Bakery, Confectionery and Tobacco Workers' Int'l Union,* 832 F.2d 81, 83 (7th Cir. 1987), quoting *United Steelworkers v. Enterprise Wheel & Car Corp.,* 363 U.S. 593, 597 (1960). "Even if a court disagrees with the arbitrator's interpretation of the agreement, so long as the award 'draws its essence from the collective bargaining agreement,' it must as a general rule be upheld." *Allied Tube,* 2000 U.S. Dist. LEXIS at *9, quoting *United Steelworkers,* 363 U.S. at 597. "It is only when the arbitrator must have based his award on some body of thought, or feeling, or policy, or law that is outside the contract. . . that the award can be said not to 'draw its essence from the collective bargaining agreement.'" *Id.* quoting *Ethyl Corp. v. United Steelworkers of America,* 768 F.2d 180, 183 (7th Cir. 1985) *cert. denied,* 475 U.S. 1010 (1986).

The central issue in this case would appear to be the intent of the Letter of Assent executed by Lid and the authority Lid Electric assigned to the ECA by executing this letter. Before addressing the Letter of Assent, however, it is necessary to address Plaintiff Lid's first argument. Plaintiff argues that the scope of the Letter of Assent is not the pivotal issue because the Alliance Policy was not "negotiated" between Local 134 and the ECA and is therefore, not any part of a binding agreement. In response defendant EJAB relies on the affidavit of Mark Nemshick, ECA Executive Vice President. Mr. Memshick states unequivocally that the "ECA and Local 134 successfully negotiated a new substance abuse policy called the...Alliance Policy." (EJAB's Exhibit 4). However, a review of this affidavit leads us to believe that it was the EJAB that "negotiated" this amendment to the labor agreement and not the ECA or Local 134. In his affidavit Mr. Nemshick, executive director of the ECA, states that he has been a member of the EJAB since 1985. That the function of the EJAB is to adjudicate disputes arising

from alleged violations of the principal agreement. The EJAB is composed of five members appointed by the ECA and five members appointed by the Local 134. He goes on to say that on Jan. 12, 1999 the EJAB unanimously agreed to implement a new mandatory drug testing program. On Sept. 21, 1999 "EJAB decided that it would implement a mandatory drug-testing program as part of the Principal Agreement, the Communication Agreement, and the Residential Agreement. Accordingly, EJAB agreed that the enabling language for the mandatory drug testing program would be drafted and inserted into the Principal Agreement." Based, apparently, on these facts, Mr. Nemshick goes on to assert that "ECA and Local 134 successfully negotiated a new substance abuse policy called the Electrical Industry Drug-Free Alliance Policy ...." In spite of this assertion it is clear from Mr. Nemshick's description of events in his affidavit that it was the membership of the EJAB that negotiated and passed this amendment to the labor agreement. It may be argued that since the EJAB is comprised of five members appointed by the ECA and five members appointed by Local 134, that an agreement negotiated by the EJAB during its meetings, is an agreement negotiated between the ECA and Local 134. However, this is not necessarily so. First, it is not clear from the submissions that the 10 members of the EJAB must be either members of the ECA or members of Local 134, only that they be *appointed* by these entities. Further, according to the affidavit, the function of the EJAB, regardless of who its members are, is not to negotiate agreements, but rather to "adjudicate [s] disputes arising from alleged violations of the principal agreement." One would not ordinarily expect amendments to the agreement that the EJAB is supposed to interpret and enforce to come out of the EJAB. Nor would one ordinarily expect the body that is supposed to adjudicate grievances between separate entities to initiate such grievances for itself to adjudicate. (According to the submissions it was the EJAB, and not the ECA or Local 134, that filed the grievance that the EJAB then decided.)

Enforcing and negotiating contracts are clearly two separate and distinct functions. This apparent lack of authority to enact the provisions involved in the current dispute is particularly important given the sensitive nature of the content of those provisions. Policies concerning drug testing implicate important constitutional privacy and freedom issues belonging to the employees. If the rationale for imposing such provisions is that the parties have consented, then the basis for such consent, at least, ought to be clear and unequivocal. There is nothing that we have found in the record before us to convince us that either the ECA as an entity or the Local 134 as an entity authorized the members of the EJAB to negotiate such changes in the labor agreement. Nor does the record reflect that the membership of either the ECA or the Local 134 considered or approved such an important change to the labor agreement. From the record before us we conclude that plaintiff is correct. The agreement was not negotiated between the ECA and Local 134. Instead, it appears the EJAB alone created the policy, attempted to impose it upon the ECA membership, filed a grievance against Lid for failing to comply with the policy and adjudicated the grievance that it itself filed.

Next, Plaintiff Lid argues that the scope of bargaining authorized in the Letter of Assent is narrow and the purported amendment goes beyond that narrow authorization. Lid argues that the Letter of Assent only grants authority to the ECA to bargain on its behalf as to "all employees performing electrical construction work within the jurisdiction of the Local Union on all present and future job sites." Thus, Lid argues that the EJAB decision finding it in violation of the Alliance Policy cannot be upheld because it does not "draw its essence" from the terms of the Principal Agreement.

A decision draws its essence from the collective bargaining contract "if the arbitrator is even arguably construing or applying the contract and acting within the scope of his authority."

*United Paperworkers, Int'l Union v. Misco, Inc.* 484 U.S. 29, 38 (1987). However, the arbitrator may no unilaterally modify the terms of the collective bargaining agreement by disregarding its plain language. *Amalgamated Transit Union, Local No. 1498 v. Jefferson Partners,* 229 F.2d 1198, 1200 (8th Cir. 2000). As Lid has argued "employee" or "employees" refers to Journeyman, General Foreman, Foreman, or Apprentices working for a contributing Employer who is reported by that Employer for purposes of Federal payroll taxes" (Principal Agreement Page 4, ¶ 2). To apply the new drug testing policy to non-union management and clerical employees of the Employer cannot be concluded to be an award which draws its essence from the contract.

Defendant EJAB, on the other hand, argues that the authority Lid Electric granted to the NECA to bargain on its behalf is plenary. Relying on Judge Kocoras's opinion in *Divane v. Krull Electric,* No. 95-C2075, 1997 U.S. Dist. LEXIS 16290 (N.D. Ill. Oct. 14, 1997), the EJAB concludes that because Lid signed the letter of assent authorizing NECA to be its "collective bargaining representative for all matters contained in or pertaining to the current and any subsequent" Principal Agreement, Lid is bound to that which the ECA negotiates. *See Krull,* 1997 U.S. Dist. LEXIS, at *6.

To support its contention, EJAB first argues "nothing in the National Labor Relations Act prohibits an employer from agreeing to contract provisions that affect employees outside of the bargaining unit." Second, the EJAB argues that nothing in the Letter of Assent Lid executed limit's ECA's authority to bargain over contract provisions that affect employees outside of the bargaining unit. Rather, EJAB argues that the ECA stepped into Lid's shoes at the bargaining table and thus could consent to any provision that Lid could consent to. Because contract provisions that affect employees outside of the bargaining unit are permissive subjects of

9

bargaining, EJAB argues ECA had full authority to consent to this permissive subject. *See Hill-Rom Co. v. NLRB*, 957 F.2d 454, 457 (7th Cir. 1990).

The parties have cited no Seventh Circuit decision directly addressing this issue and this Court is not aware of any such decision. Lid argues that language on the face of the letter of assent restricts the NECA to bargaining only over " 'matters contained in or pertaining to' the Principal Agreement 'for all employees performing electrical construction work within the jurisdiction of the Local Union.'" (Plaintiff's Response at 4). Thus, Lid argues that nothing in the Letter of Assent grants or authorizes either the Union or the NECA to affect the terms and conditions of employment for Lid's other employees. (Plaintiff's Motion for Summary Judgment at 4). In addition to the language of the Letter of Assent quoted above, the Letter of Assent reads:

> The Employer agrees that if a majority of its employees authorize the Local Union [134] to represent them in collective bargaining, the Employer will recognize the Local Union [134] as the NLRA Section 9(a) collective bargaining agent for all employees performing electrical construction work within the jurisdiction of the Local Union on all present and future jobsites.

(Defendant's Statement of Facts ¶23).

Lid, however, has neither pointed to anything in the record nor substantive law to support its contention that this statement limits the scope of Lid's assent to be represented by the ECA only to matters concerning employees within the unit represented by Local 134. The Eighth Circuit, however, has interpreted this clause to be only a "majority-employee-authorization provision." *Local Union 257, IBEW v. Sebastian Elec.*, 121 F.3d 1180 (8th Cir. 1997). In *Sebastian*, the Eighth Circuit ruled that an employer's assent to be represented by the ECA was not affected by the fact that a majority of its employees had not authorized the Local in question to negotiate on their behalf. *Id.* at 1185-86. Thus, in following the Eighth Circuit's rule, it is

10

difficult to see how the letter of assent, as Lid argues, binds the ECA to negotiate only matters affecting Local 134 if it is not even necessary that the union represent the employer's employees in the first place.

The Eleventh Circuit would likely agree with Lid's narrow reading of the scope of authority granted to the ECA. In *McDonald v. Hamilton Electric,* 666 F.2d 509 (11th Cir. 1982), that court of appeals faced the question of whether the scope of authority given to the Florida branch of the NECA by an employer's letter of assent was plenary. *Id.* at 513. The Eleventh Circuit answered that question in the negative. The Eleventh Circuit instead looked to the collective bargaining agreement (CBA) between the parties to ascertain the scope of bargaining authority granted to the parties. *Id.* The Eleventh Circuit held that because the CBA limited the employer's recognition of the union "as the exclusive representative of all its employees for the purpose of collective bargaining in respect to wages, hours of employment and conditions of employment" this provision limited the scope of the collective bargaining agreements to mandatory subjects of bargaining only. *Id.*

The Seventh Circuit, however, seems to have taken a broader view as to the scope of bargaining authority given to an employer association such as the ECA. *See Int'l Union of Operating Engineers, Local 150 v. Bliudzius Contractors, Inc.,* 730 F.2d 1093 (7th Cir. 1984); *Divane v. Krull Electric,* No. 95-C2075, 1997 U.S. Dist. LEXIS 16290 (N.D. Ill. Oct. 14, 1997). In order to support its contention that the authority granted to the ECA to bargain on behalf of Lid is plenary, the EJAB relies on *Divane v. Krull Electric.* The issue in that case revolved around whether the defendant could assert that it did not receive notice about a contract amendment and was therefore not bound to that amendment. The court in *Divane* held that the plaintiff union could enforce the amendment "as written" and the defendant could then argue

lack of notice as a defense to being bound to its terms. The court pointed out that in *Divane,* "Krull appointed the [ECA] as its bargaining representative. Thus Krull is bound by the terms negotiated by the [ECA]." *Divane,* 1997 U.S. Dist. LEXIS at *7.

Here, defendant EJAB argues that Lid gave the ECA authority to bargain for the Alliance Policy, which by its terms affects employees outside of the bargaining unit. We cannot agree. The Letter of Assent authorizes the ECA to be its collective bargaining representative for all matters contained in the labor agreement between the ECA and Local 134. The labor agreement defines employee or employees to be Journeymen, General Foreman, Foreman or apprentices working for a contributing employer (Principal Agreement Article I, §1.02 ¶ 10).

It is a fundamental underpinning of federal labor law that subjects of collective bargaining fall in one of three categories: mandatory, permissive and illegal. *NLRB v. Wooster Div. of Borg Warner Corp.,* 356 U.S. 342 (1958). Mandatory subjects of bargaining affect the "wages, hours, and other terms and conditions of employment." *Id.* Parties to a collective bargaining agreement must bargain over mandatory subjects of bargaining. *Id.* The parties may bargain over permissive subjects. *Id.* Contract provisions affecting employees outside of the bargaining unit are generally considered permissive subjects. *Allied Chem. & Alkali Workers, Local Union No. 1 v. Pittsburgh Plate Glass Co.,* 404 U.S. 157 (1971).

The EJAB argues that the application of the Alliance Policy to employees outside of the unit represented by Local 134 is a permissive subject of bargaining. The EJAB further argues that because the ECA agreed to the provision, Lid is bound to follow the Alliance Policy. This court disagrees. Drug testing programs effecting a change in working conditions governed by a collective bargaining agreement have been considered as a major dispute where the duty to bargain has arisen. *Brotherhood of Locomotive Engineers v. Burlington Northern,* 838 F.2d

1087, 1093 (9th Cir. 1988); *Order of Railroad Telegraphers v. Chicago & Nw. Ry.*, 362 U.S. 330, (1960), and *United Industrial Workers v. Board of Trustees of Galveston Wharves*, 351 F.2d 183 (5th Cir. 1965).

In this case it is undisputed that Lid's employees who were not members of the union reached no type of agreement as to the union's authority to negotiate the surrender of their constitutional or common law right of privacy. Indeed, the October letter from ECA to its member organizations states "The Electrical Joint Arbitration has in no way collectively bargained for your office personnel but is counting on each employer to see the benefits of this Drug-Free Alliance for all involved, and our industry's customers as well." From this letter it is clear that the ECA did not believe that either it or the "Electrical Joint Arbitration" (sic) was bargaining for its member's office personnel. Who then consented on behalf of these workers? We conclude that there was no consent by Lid to enable the ECA to represent or bargain on behalf of Lid's non-bargaining unit employees. There was never an intent to authorize the ECA to bind it with respect to the working conditions of its management and office personnel.

## CONCLUSION

For the reasons stated above, the defendant's cross motion for summary judgment is granted and the plaintiff's motion for summary judgment is denied. The EJAB exceeded its authority and its award against Lid does not draw its essence from the Principal Agreement because the provisions in question were not bargained for or agreed to by the ECA and Local 134 and thus did not form part of the Principal Agreement and Lid's non-bargaining unit

employees are not covered by or subject to its terms. The December 19, 2001 decision of the EJAB is hereby vacated. This case is hereby terminated. This is a final and appealable order.

9/19/03

So Ordered:

Ronald A. Guzman
United States Judge